***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before Deputy Commissioner Rowell and in a Pre-Trial Agreement admitted into evidence as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At times relevant to this claim, an employment relationship existed between the plaintiff-employee and defendant-employer.
3. The Form 18 in I.C. No. 930453 listed an onset date of December 10, 1998. I.C. No. 061241 listed a date of February 28, 2000. Defendant Key Risk Management Services was the carrier on the risk from September 1, 2000 through the present. Cybercomp, now removed pursuant to the compromise settlement agreement, insured defendant-employer from September 1, 1999 through August 31, 2000. Prior coverage was provided by EBI and the claim against EBI was settled by mediated settlement agreement dated August 14, 2000.
4. Plaintiff's average weekly wage was to be determined by a Form 22.
5. The Pre-Trial Agreement was admitted into evidence as Stipulated Exhibit 1.
6. The following documents were admitted into evidence as shown in a Table of Contents and marked as Stipulated Exhibit #2:
 a. Form 18 dated June 11, 1999, Form 19 dated December 11, 1998, Form 33 dated June 14, 1999, Form 33R from EBI Companies dated June 29, 1999, Form 33R from Sedgwick of the Carolinas, Inc., dated February 15, 2000, Form 33R from Cybercomp c/o Crawford and Company dated August 3, 2000, Form 61 dated February 15, 2000, Form 61 dated June 19, 2000, Order filed April 5, 2000 by Executive Secretary Tracey Weaver, and Form 22's.
 b. The Mediated Settlement Agreement as to EBI Companies dated August 14, 2000.
 c. Compromise Settlement Agreement as to Cybercomp approved by the Commission on March 27, 2002.
d. Plaintiff's Answers to Interrogatories from Sedgwick.
e. Plaintiff's Answers to Interrogatories from EBI Companies.
f. Plaintiff's recorded statement.
g. Carrier forms and correspondence.
 h. Records from Occupational Health Services, Catawba Memorial Hospital.
 i. Medical records of Dr. Herbert J. Schulten, Carolina Orthopaedic Specialists.
j. Medical records of Dr. E. Brown Crosby.
k. May 27, 2000 report of Al Gorrod.
l. Employee's week-by-week gross income.
7. The Order of the Full Commission dated January 16, 2002 was admitted into evidence as Stipulated Exhibit 3.
8. The issues to be determined by the Full Commission are whether plaintiff contracted an occupational disease; whether defendant-employer and Key Risk are responsible for plaintiff's occupational disease after September 1, 2000; and, if so, to what, if any, benefits is plaintiff entitled.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. On December 10, 1998 plaintiff was a thirty-eight year old female employed by defendant as an upholstery sewer. Plaintiff has a tenth grade education. Defendant-employer manufactures upholstered furniture such as living room furniture, sofas, loveseats, chairs and ottomans. Plaintiff began employment with defendant-employer in February 1996.
2. Plaintiff's job duties consisted of repetitive use of both hands to sew the decorative cord around the edges of cushions and to sew pleats and elastic. Plaintiff worked nine hours per day, 40-45 hours per week. Plaintiff sewed from 100 to 200 sets of upholstery per day, making pillows, cushions, and doing flatwork sewing welt onto pieces of upholstery. Plaintiff used both hands in her job, twisting, turning and pulling repetitively while using scissors, elastic, pull, and weltboard.
3. Approximately December 1998 plaintiff began experiencing pain in her right hand. Defendant-employer sent plaintiff to the local occupational clinic which then referred her to an orthopedic surgeon, Dr. Herbert Schulten.
4. Plaintiff first saw Dr. Schulten in January 1999. Plaintiff complained of pain and numbness in her right hand. Diagnostic tests Tinel's, Durkanis and Phalen's were all positive for right carpal tunnel syndrome. These same tests were negative on the left hand. Dr. Schulten recommended a right carpal tunnel release.
5. Plaintiff did not undergo a right carpal tunnel release until July 12, 1999. Plaintiff had begun experiencing right thumb numbness. During surgery, the right medium nerve was pale in color but by the end of the operation had turned pink indicating a better blood supply.
6. Following surgery, plaintiff's numbness in her right hand improved; but the pain on the right wrist did not. Plaintiff also continued to have problems with her right thumb but her symptoms improved somewhat by the end of August 1999.
7. On August 30, 1999 plaintiff returned to work for defendant-employer in her regular position as a flat sewer. As a result of plaintiff's July 1999 surgery, Dr. Schulten assigned a ten percent (10%) permanent partial disability rating to her right hand and considered her at maximum medical improvement.
8. After plaintiff returned to work, she progressively began having more problems with her right hand. Plaintiff also experienced pain and numbness in her left hand.
9. On February 28, 2000 plaintiff sought treatment from Dr. E. Brown Crosby of Asheville Hand Center. A physical exam revealed mild tenderness in the area of the carpal tunnels bilaterally. Plaintiff had positive Tinel's, Phalen's and medium nerve compression tests on the left hand. There was dysesthesias, or aberration of the nerve function, on the right hand. Dr. Crosby recommended bilateral hand therapy.
10. Therapy did not improve plaintiff's symptoms. At the April 27, 2000 visit with Dr. Crosby, plaintiff continued to have significant symptomology of bilateral carpal tunnel syndrome. Plaintiff requested Dr. Crosby not place work restrictions on her because for financial reasons plaintiff wanted to continue to work at her maximum pay.
11. At the August 17, 2000 visit with Dr. Crosby, plaintiff continued to have problems with both hands. Although the numbness was gone in her right hand, she continued to have aching and loss of strength in that hand. With respect to her left hand, plaintiff continued to have numbness and tingling. Tests on that date reveal a positive Tinel's and median nerve compression test with respect to her left hand, while tests were not positive on the right hand. Plaintiff has become progressively more clumsy with her left hand, dropping items and unable to manipulate small items as well as losing strength in her left hand.
12. By the September 21, 2000 visit with Dr. Crosby, plaintiff admitted she should cut back on working because she had difficulty coping in the workplace and with her activities of daily living. Dr. Crosby fitted plaintiff with splints for both wrists of a cock-up design. Dr. Crosby also restricted plaintiff to half-day work status for two weeks.
13. Plaintiff continued to experience pain in both hands, made worse with longer working hours. Dr. Crosby released plaintiff to return to regular work as tolerated effective October 10, 2000. Plaintiff continued to work for defendant-employer until an April 26, 2001 economic layoff. Plaintiff received unemployment benefits during the layoff period. Plaintiff's pain and numbness in her hands lessened while she was not working.
14. On September 24, 2001 plaintiff returned to work as an upholsterer sewer for Dunmore-Kroehler Furniture, which is not affiliated in any way with defendant-employer. Plaintiff's pain and numbness in her hands and wrists flared up again after she started working, but she received no medical treatment during this period.
15. On January 2, 2002 plaintiff was rehired by defendant-employer in her regular job. The pain and numbness in plaintiff's hands and wrists worsened and she returned to Dr. Crosby for treatment. Plaintiff complained of more numbness in her left hand than in the right hand, but more pain in the right than in the left. Because of financial necessity, plaintiff continued to work at defendant-employer at the time of the hearing before Deputy Commissioner Rowell. As of June 6, 2002 Dr. Crosby recommended that plaintiff undergo surgery on her left hand before she sustains further damage.
16. The greater weight of the evidence shows that plaintiff's duties as a sewer at defendant-employer caused or substantially contributed to plaintiff's right carpal tunnel syndrome in December 1998 and bilateral carpal tunnel syndrome in February 2000. Additionally, plaintiff's employment with defendant-employer as a sewer in December 1998 and February 2000 placed her at an increased risk of acquiring and aggravating carpal tunnel syndrome as compared to members of the general public not so employed.
17. On August 15, 2000 plaintiff partially settled her claim with defendant-employer and EBI Companies with respect to the right carpal tunnel syndrome of December 10, 1998 up to and including September 1, 1999. As part of the terms of this agreement, plaintiff's medical expenses through September 1, 1999 were paid. Plaintiff released defendant-employer and EBI companies only for the period on and before September 1, 1999. This agreement was approved by Order of Deputy Commissioner Stephenson filed October 23, 2000.
18. After the Full Commission order adding Key Risk as a party defendant and requiring a hearing de novo, plaintiff partially settled her claim with defendant-employer and CyberComp by compromise settlement agreement approved by the Commission on March 27, 2002. This agreement related to the period September 1, 1999 through September 1, 2000. This agreement would include payment of any temporary partial disability compensation due plaintiff for the half-day work status for the two weeks after the September 21, 2000 visit to Dr. Crosby.
19. The greater weight of the evidence is that plaintiff suffered a worsening of her carpal tunnel syndrome after she returned to work for defendant-employer on January 2, 2002. Plaintiff's job duties aggravated her bilateral carpal tunnel to the extent that after Dr. Crosby again recommended surgery on June 6, 2002, plaintiff was willing to undergo surgery but for her financial circumstances and need to continue to work.
20. Plaintiff has proven by the greater weight of the evidence that her last injurious exposure to the hazards of bilateral carpal tunnel syndrome while employed by defendant-employer occurred in the period after January 2, 2002 when Key Risk was the carrier on the risk.
21. At the time of the hearing before the Deputy Commissioner, defendant-employer had non-repetitive work available, but none had been offered to plaintiff.
22. Plaintiff is not at maximum medical improvement and still is in need of medical treatment, including left carpal tunnel release.
23. As of the March 26, 2002 visit to Dr. Crosby, plaintiff was having increasing problems with both hands due to full time work with a tremendous amount of overtime. Dr. Crosby restricted plaintiff to limited overtime depending on plaintiff's tolerance. The record does not contain any evidence of the actual wages paid to plaintiff after March 26, 2002 and therefore the diminution of plaintiff's wage earning capacity, if any, cannot be computed by the Commission.
24. Plaintiff's average weekly wage pursuant to an Industrial Commission Form 22 at the time of the contraction of the occupational disease in December 10, 1998 was $648.83, yielding a compensation rate of $432.58 per week.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. The acquisition and aggravation of plaintiff's right carpal tunnel syndrome in December 1998 and bilateral carpal tunnel syndrome in February 2000 was due to causes and conditions characteristic of and peculiar to the employment with defendant-employer. Carpal tunnel syndrome is not an ordinary disease of life to which the general public not so employed is equally exposed and is, therefore, a compensable occupational disease. N.C. Gen. Stat. § 97-53(13); Hansel v. ShermanTextiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
2. Key Risk was the insurance carrier on the risk when plaintiff was last injuriously exposed to the hazards of carpal tunnel syndrome. N.C. Gen. Stat. § 97-57. Last injurious exposure is defined as an exposure that proximately augments the disease to any extent, however slight. Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). Last injurious exposure does not require a showing of a "significant contribution" to the occupational disease. Cain v. Guyton,79 N.C. App. 696, 340 S.E.2d 501, affirmed, 318 N.C. 410, 348 S.E.2d 595
(1986).
3. As a result of plaintiff's bilateral carpal tunnel syndrome, plaintiff is entitled to temporary partial disability benefits at the rate of two thirds (2/3) of the difference, if any, between her average weekly wage of $648.83 and wages earned after March 26, 2002 continuing for a period of 300 weeks from the date of contraction of the occupational disease. N.C. Gen. Stat. § 97-30.
4. Plaintiff is entitled to have defendant Key Risk provide all medical treatment arising from this compensable occupational disease to the extent it tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, -59.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Commission enters the following:
 AWARD
1. Defendant-employer and Key Risk shall pay temporary partial disability compensation to plaintiff at the rate of two-thirds (2/3) of the difference, if any, between her average weekly wage of $648.83 and the actual wages earned after March 26, 2002 continuing for a period of 300 weeks from December 10, 1998, the date of contraction of the occupational disease. Those amounts which have accrued shall be paid in a lump sum. If the parties are unable to agree upon the amount of compensation due for plaintiff's temporary partial disability, the parties may move the Commission for an appropriate order upon the submission of additional wage information.
2. Defendant-employer and Key Risk shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable occupational disease.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation, if any, awarded plaintiff in paragraph 1 of this AWARD is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendant-employer and Key Risk shall pay the costs.
This the ___ day of October, 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________ RENE C. RIGGSBEE COMMISSIONER